Alvae WINTERTON, Respondent,

v.

Boydie Clay VAN ZANDT, Defendant,

and

Farmers Insurance Exchange, a Reciprocal Inter-Insurance Exchange, Garnishee, Appellant.

No. 48226.

Supreme Court of Missouri,

Division No. 1.

Nov. 13, 1961.

Motion for Rehearing or to Transfer to Court en Banc Denied Dec. 11, 1961.

William G. Johnson, Versailles, Donald E. Willson, S. David Trusty, Kansas City (Popham, Thompson, Popham, Trusty & Conway, Kansas City, of counsel), for appellant.

William J. Cason, Kelso Journey, Clinton, for respondent.

HOLLINGSWORTH, Judge.

Garnishment. On January 23, 1953, plaintiff Alvae Winterton, a resident of the State of Iowa, recovered judgment by default in the Circuit Court of Henry County against Boydie Clay Van Zandt in the sum of $14,250 for personal injuries and property damages sustained in a collision of a motor truck owned and operated by plaintiff and an automobile operated by defendant but owned by one Fred Marsh. Thereafter, plaintiff, acting under a general execution issued on said judgment, initiated this garnishment proceeding against Farmers Insurance Exchange seeking to enforce payment thereof in accordance with an "omnibus clause" contained in a policy of liability insurance issued by Exchange to Marsh covering his liability for bodily injuries and property damages arising out of the ownership, maintenance or use of the aforesaid automobile. Garnishee admitted that said policy was in full force and effect but denied liability to plaintiff under its terms and provisions. Trial of that issue to a jury in Morgan County on change of venue from Henry County resulted in a judgment for plaintiff against garnishee in the sum of $12,500 with 6% interest thereon from January 23, 1953, in the sum of $5,250, total $17,750, from which judgment garnishee has appealed. The amount in dispute vests this court with jurisdiction of that appeal.

The policy in question obligates the insurer to pay on behalf of the insured all sums which he shall become obligated to pay not exceeding $10,000 for bodily injuries sustained by any one person and not exceeding $5,000 for destruction of property caused by accident and arising out of the ownership, maintenance or use of the automobile. The "omnibus clause", insofar as here material, provides:

"With respect to the insurance for bodily injury liability and for property damage liability the unqualified word 'insured' includes the named insured and also includes any person while using the automobile * * *, provided the actual use of the automobile is by the named insured or with his permission * * *."

It is admitted that defendant came into possession of Marsh's automobile in Kansas City, Missouri, on September 9, 1952, and that on said date he drove it into collision with plaintiff's truck in Henry County, Missouri, a distance of some sixty miles from Kansas City. Garnishee's first contention is that the trial court erred in refusing to sustain garnishee's motion for a directed verdict filed at the close of all of the evidence for the reason that under the evidence most favorable to plaintiff Marsh had given defendant permission to use his car only for the purpose of driving it four blocks to a grocery store to make a purchase and thereupon to return with said purchase and that there was no evidence that the permission so granted authorized defendant to make a journey on his own account into Henry County, a distance of sixty miles from Kansas City.

The evidence viewed in the light most favorable to plaintiff supports a finding of the following facts: On September 9, 1952, Boydie, more than 30 years of age, resided in Kansas City with his brother, Ben Van Zandt, and the latter's wife, Helen, and their child in a small apartment. On September 9, Boydie did not go to work. After breakfast, about 9 o'clock, he, with the Van Zandts' small child, went out for a stroll. About 10 o'clock, they returned and Boydie asked Mrs. Van Zandt if he could bring a friend of his, Fred Marsh, whom Mrs. Van Zandt did not know, to the apartment to shave, saying they were going "some place" and that he (Marsh) did not want to go all the way home. Mrs. Van Zandt consented and Boydie left the apartment. He and Marsh appeared at the apartment at about 2 o'clock in the afternoon. Both had been drinking and they brought beer with them. Boydie introduced Marsh as an "old friend" and they talked within the hearing of Mrs. Van Zandt about places they together had visited. Mrs. Van Zandt was engaged in cooking a pot of pinto beans in preparation of the evening meal. Marsh said he could make a good Italian dish and asked for some spaghetti and macaroni, which she furnished, and Marsh and Boydie "mixed it all up." They decided there was not enough spaghetti, so Marsh gave Boydie several bills and told him to go to the store and get more. When Boydie left, Mrs. Van Zandt, her small son and Marsh were left alone in the home.

The store was four blocks from the apartment and Boydie came back in about 20 minutes. During Boydie's absence, Marsh sat at the kitchen table drinking beer. When Marsh took over the cooking, he had asked for onions, but none were at hand, so Marsh, upon Boydie's return, told him to go back to the store to get some. Boydie said it was too far to walk and said, "I am going to take your car." Marsh's car keys were then in front of him on the kitchen table at which he sat. Marsh picked up the keys, held them up, nodded affirmatively at Boydie and laid them down. Boydie picked up the keys. Mrs. Van Zandt asked Boydie not to leave her alone. Boydie and Marsh talked privately and Mrs. Van Zandt heard Marsh say, "If you are going, you better get going." Boydie and Marsh then went into a restroom in the hall, talked some more, and Boydie left. Mrs. Durham, who lived in an upstairs apartment, came into the Van Zandt apartment about that time and

Mrs. Van Zandt asked Mrs. Durham to stay with her.

Mrs. Van Zandt and Mrs. Durham went into the kitchen, where Mrs. Van Zandt said to Marsh, "You know him (Boydie) better than I thought you did or you wouldn't let him have your car." Marsh replied, "Boydie is all right, he will bring it back." Mrs. Van Zandt told Marsh, "I'll give him twenty minutes to get back; if he doesn't get back in 20 minutes, your car is gone." Marsh said, "Oh, he'll be back." When 30 minutes had passed, Marsh looked at his watch and said, "Well, 30 minutes is up, but I will give him a little longer." Marsh, however, then went into the front room and lay upon the couch and went to sleep. None of the food which Marsh undertook to prepare was ever eaten. Mrs. Van Zandt, her small son and Mrs. Durham left the apartment. They went for a walk and then waited in front of the apartment for the return of Mrs. Van Zandt's husband from work. Upon his return about 4:30 p. m., he was advised of the situation. He went upstairs, succeeded in arousing Marsh, and said, "Have you called the police about your car?" Marsh said, "Why no, I haven't called the police, Boydie will be back." Mr. Van Zandt told him he could use a phone at the end of the hall and urged him to call the police, but Marsh insisted that "Boydie is a nice guy and he will be back." Eventually, Marsh left the apartment about 5:20 p. m. and returned about 6:30 p. m. Asked if he had called the police, he stated he had not, but said, "The State Patrol called me and told me that Boydie had had a wreck in my car near Clinton." He made no contention that Boydie had stolen his car and said nothing about having him arrested. The Van Zandts did not see him again until about 7:30 p. m. the next day when he returned with a man and lady from an insurance company.

Garnishee insists that under this evidence Boydie "violated the agreement with Marsh concerning the use of his car. He had embarked on a mission of his own in no wise connected with the purpose for which he was given permission to use the car. He excluded himself from the provisions of the policy." Cited in support of that contention are: 5 A.L.R.2d, l. c. 624–626, 636; Guthrie, Admr. v. Holmes, 272 Mo. 215, 198 S.W. 854; McKee v. Travelers Insurance Co., Mo.App., 315 S.W.2d 852; Speidel v. Kellum, Mo.App., 340 S.W.2d 200.

The annotation found in 5 A.L.R.2d, at pages 600–668, is exhaustive and generally informative but, inasmuch as it treats exclusively with the proper construction to be placed upon omnibus clauses in liability policies where the vehicle was being driven by a servant with the alleged permission of the master, it is not particularly helpful in the instant case. As stated in the beginning of the annotation, l. c. 602, "[T]he master and servant relationship gives rise to a number of distinct and peculiar problems regarding the permissive use of the employer's vehicle which do not exist in cases where the relationship is more of a social nature." Thus, the annotation is primarily concerned with the varying and conflicting rules established by the appellate courts of our sister states in determining the effect upon the insurer's liability under the policy in cases where the servant is shown to have deviated from the course of the employment which permits his use of the vehicle. Brief mention of these conflicting rules will suffice. The courts of a number of states hold that even in cases involving a master and servant relationship the omnibus clause in automobile liability policies is as much for the benefit to the general public as for the benefit of the additional insured and they construe such clauses to mean that if the employee has express or implied permission of the owner initially to operate the vehicle, any operation thereof by the employee is considered to be within the scope of the permission granted, regardless of how grossly the terms of the permission originally granted may have been violated. Some courts adopt the so-called conversion rule in such cases, namely, that where the use of the vehicle exceeds the scope of employment so as to make the employee liable to the named

insured in an action for conversion of the vehicle, such use thereof does not come within the coverage of the policy. A third rule is the minor deviation rule, wherein it is held that if the use of the vehicle by the employee is not a gross violation of the permission granted, protection is still afforded under the policy. 5 A.L.R.2d 624–626; 7 Appleman, Insurance Law and Practice, §§ 4366–4368, pp. 169–185, and cases therein cited; McKee v. Travelers Insurance Co., Mo.App., 315 S.W.2d 852, 855.

The three cases cited by garnishee also deal with a master and servant relationship. In McKee v. Travelers Insurance Co., 315 S.W.2d 852, supra, the St. Louis Court of Appeals took notice of the foregoing rules but, under the fact situation there presented, found it unnecessary to adopt either of them, predicating its opinion in that case upon another rule governing the use of the master's motor vehicle by the servant, 1. c. 857, to wit: "[W]hen an employee uses his employer's automobile for his own purposes, contrary to *and in direct violation of the employer's specific orders,* * * *, the employee does not have his employer's permission to use the vehicle within the meaning of the omnibus clause, * * *." (Italics supplied.) In Speidel v. Kellum, Mo. App., 340 S.W.2d 200, 1. c. 202–203, the Kansas City Court of Appeals found that the only permission given by the employer to use his Buick automobile was a direction to the servant to do the thing he was instructed to do, namely, to go to the garage, get the automobile and return it, and that he was not given permission to drive the car for pleasure; and that, hence, the servant was not within the protection of the omnibus clause of the insurance policy there in question. Guthrie Adm., v. Holmes, 272 Mo. 215, 198 S.W. 854, is strictly a master and servant case involving only the doctrine of respondeat superior and is in no wise concerned with liability insurance. Insofar as here material, it merely quotes with approval from an earlier court of appeals case, 198 S.W. 1. c. 859, to wit: " 'Where a chauffeur, either with or without his master's consent,

uses the machine for his own business or for his own pleasure, and negligently inflicts injury on another, the master cannot be held liable, for the reason that the negligent act, being entirely outside the scope of the servant's employment, cannot call into action the rule of respondeat superior. The fact of consent is material only in the solution of the issue of whether or not the use of the machine was, in fact, on business of the master.' "

The law declared in those cases is not applicable to the situation presented in the instant case. This case was tried and submitted upon the theory that the facts in evidence warranted a finding by the jury that at the time and place of the collision of the truck driven by plaintiff and Marsh's automobile driven by defendant, he, defendant, was operating Marsh's automobile with Marsh's permission, express or implied.

■■■ There is no ambiguity in the meaning of the word "permission". McKee v. Travelers Ins. Co., Mo.App., 315 S.W. 2d 852, 857. Webster's New International Dictionary, 2nd Ed., defines it: "Act of permitting; formal consent; authorization; leave; license or liberty granted." It has a flexible meaning depending upon the sense in which it is used. Allstate Insurance Co. v. Hartford Accident & Indemnity Co., Mo.App., 311 S.W.2d 41, 45[1]. Moreover, the policy in the instant case provides that it "shall comply with the provisions of the motor vehicle financial responsibility law of the state" with respect to such liability arising out of the use of the automobile to the extent of liability required by such. law. Section 303.190 of the Motor Vehicle Safety Responsibility Law of Missouri, Chapter 303 RSMo 1959, V.A.M.S., requires that policies issued under § 303.170 as proof of financial responsibility shall insure "any other person, * * * using any such motor vehicle * * * with the express or implied permission of such named insured." The provisions of that act are indicative of the public policy of this state to assure financial remuneration to the

extent and under the conditions therein provided for damages sustained through the negligent operation of motor vehicles upon the public highways of this state not only by the owners of such automobiles but also all persons using them with the owners' permission, express or implied. It is clear, therefore, that this policy should be liberally construed to include within its coverage any person using Marsh's automobile with his permission, express or implied, to so use it. Jordan v. Shelby Mutual Plate Glass & Casualty Co., D.C., 51 F.Supp. 240; affirmed 4 Cir., 142 F.2d 52, 54. "Where the vehicle is loaned for a specific purpose but used for some other purpose, a general permission or a comprehensive permission is much more readily to be assumed if the use of the vehicle is for social rather than business purposes and where the relationship of master and servant does not exist." 7 Appleman, Insurance Law and Practice, § 4368, 1961 pocket part, page 68. See also Scott v. Massachusetts Bonding & Ins. Co., Ky., 273 S.W.2d 350, 352; Trinkle v. American Employers' Ins. Co., D.C.Ky., 180 F.Supp. 233; Jordan v. Shelby Mut. Plate Glass & Casualty Co., 4 Cir. (Va.) 142 F. 2d 52, 54.

█ Bearing in mind the law above announced, we consider the facts and circumstances in evidence to determine whether they support the finding of the jury that defendant was using Marsh's car with Marsh's permission, express or implied, at the time and place of the collision. When defendant first returned to the Van Zandt apartment at 10 o'clock, he told Mrs. Van Zandt that he and his friend Marsh were going some place on a joint venture. When they arrived some four hours later, both had been drinking; they spoke of their prior joint social ventures; they were, on this occasion at least, boon social companions; March was perfectly willing for his friend to use his car to go after the onions and gave his express permission to that venture. Later, after Mrs. Van Zandt asked defendant not to leave her, defendant and Marsh conferred privately and Marsh

was heard to say to defendant, "If you are going, you better get going"; when defendant did not return Marsh, expressing confidence in defendant, promptly went to sleep and slept throughout the afternoon. When awakened late in the afternoon and urged to report defendant's failure to return to the police, March said, "Why, no, I haven't called the police, Boydie will be back"; and even when he had learned of the collision he did not complain of any wrongdoing on the part of defendant. We are constrained to hold that the facts and circumstances in evidence warranted submission of the issue of whether defendant was using Marsh's car at the time and place of the collision with his permission, express or implied.

Garnishee's second assignment is: "The policy issued to Marsh provides that if suit is brought against the insured he shall immediately forward to garnishee every demand, notice, summons or other process received by him or his representative. Assuming that Boydie Clay Van Zandt was insured under the policy he violated the terms thereof in that he failed immediately to forward to garnishee the petition and summons served on him and the entry of appearance signed by him. Therefore, the garnishee is relieved of any obligation under said policy."

The evidence introduced in behalf of plaintiff shows that following the collision on September 9, 1952, Boydie was taken to a hospital. On September 10, 1952, the garnishee began an investigation of the case by interviewing both Marsh and Mr. and Mrs. Ben Van Zandt. On September 12, 1952, plaintiff's action for damages against Boydie was brought in the circuit court, at which time summons was served upon Boydie and, at the instance of plaintiff's counsel, Boydie signed an entry of appearance, a copy of which was left with him, together with a copy of the petition. Some five or six days after the collision, Ben Van Zandt called to see defendant at the hospital, at which time defendant gave him "some papers" that had "something

to do with the insurance" and told Ben to deliver them to the "insurance man". Ben Van Zandt saw plaintiff's name, "Alvae Winterton", on them. They consisted of several pages and "looked like" copies of the petition and entry of appearance shown to the witness at the trial. Ben delivered these papers to a representative of garnishee several days after they were given him by Boydie.

Thereafter on November 12, 1952, counsel for plaintiff, by registered mail, sent letters to (1) garnishee's agent at Clinton, Missouri, (2) to the insured, Fred Marsh, and (3) to garnishee, advising each of them fully of the pendency, venue and nature of the action and plaintiff's contention that Boydie was covered by the provisions of the omnibus clause. Postal return receipts for these letters were admitted into evidence. On December 16, 1952, garnishee instituted a declaratory judgment proceeding in the circuit court of Jackson County against Marsh, Boydie Van Zandt and "William J. Cason, as agent for Alvae Winterton" (plaintiff herein), seeking to obtain a decree to the effect that Boydie was not an additional insured under the policy. Despite the fact that no valid service was ever had upon Winterton, a decree was rendered in that case as prayed. (Garnishee does not here contend that said judgment was of any validity as against plaintiff.) Thereafter, garnishee refused to defend the original action brought by plaintiff against Boydie.

 Substantial compliance with the provisions of the policy in the respects asserted by the garnishee is a condition precedent to garnishee's liability under the policy but a mere failure to comply with such provisions in some immaterial respect does not justify disclaimer of liability. Northwestern Mut. Ins. Co. v. Independence Mut. Ins. Co., Mo.App., 319 S.W.2d 898, 901–905, and the many authorities collected therein. The trial court, in the verdict-directing instruction given in behalf of plaintiff, submitted a finding of defendant's compliance with the provisions of the policy relating to the aforesaid provisions as one of the conditions of returning a verdict in plaintiff's favor. We think the finding of the jury that he had complied with those provisions was amply supported by the evidence. The contention should be and is denied.

Garnishee's next contention is that the court "erred in refusing certain portions of a photographic reproduction of the official report made by the Missouri Highway Patrol of the collision between Winterton and Van Zandt, which report was offered in evidence by appellant. The portion of the report which was excluded was to the effect that the car had been reported stolen to the Kansas City police earlier in the day and that Van Zandt was suspected of car theft, and that the matter was then pending."

 The record shows that, following due identification of a microfilm copy of an "accident report" prepared and signed by the investigating highway patrolman on the day following the collision, garnishee offered the same in evidence as being a record made in accordance with "The Uniform Business Records as Evidence Law", §§ 490.660–490.690 RSMo 1959, V.A.M.S. The trial court sustained plaintiff's objection made to the hereinafter described portions thereof. Under the printed heading "Remarks", the following statement had been typewritten: "Car had been reported stolen to the Kansas City Police earlier in the day"; and under a printed heading "Show Arrests and Charges", the following statement had been typewritten: "Boydie Clay Van Zandt Car theft Pending." Obviously, the comment that the "car had been reported stolen to the Kansas City Police earlier in the day" could not have been within the personal knowledge of the highway patrol officer who filed the report. It is not even contended he could have had first hand information as to what had been reported to the Kansas City police. While the uniform business records law eliminates,

in a general way, any valid objection that the above written recital is hearsay "if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission", yet if it appears that the person making the report would not have been a competent witness to testify that the recitals in the report were correct, such recitals may and should be rejected by the trial court. Capra v. Phillips Investment Co., Mo., 302 S.W. 2d 924, 936. If the police records of Kansas City had been offered in evidence and had shown a report of theft of the car, we would be confronted with a quite different situation. But the highway patrol report of what had been reported to the Kansas City police is hearsay upon hearsay and was not competent. Kansas City Stockyards Co. v. A. Reich & Sons, Mo., 250 S.W.2d 692, 700[18, 19]; Ryan v. Campbell "66" Express, Mo., 304 S.W.2d 825, 828[3, 4]. As to the recital of the arrest of "Boydie Clay Van Zandt Car theft Pending", such a statement contained in a report made out on the day following the arrest does not constitute proof of a report made by or at the direction of Marsh that his car had been stolen. Actually, the record shows that Boydie was never prosecuted for theft of the car. The fact that following the collision he was arrested on such a charge, at the instance of whom is not shown, constitutes no evidence of his guilt or that he was driving Marsh's car without permission, express or implied. The court did not err in excluding that portion of the report.

Garnishee next contends that the court "erred in giving plaintiff's Instruction No. 1 for the reason (a) that there is no evidence to support, as was submitted in paragraph 6, whether 'the actual use of said club coupe by said Van Zandt was with the express or implied permission of said Fred Marsh,' and for the further reason (b) that said instruction conflicts with garnishee's Instruction No. 6, which authorized a verdict for the garnishee if the only permission given by Marsh to Van Zandt was to use the car to go to the

grocery store to make the purchase referred to in evidence." This contention, perforce our disposition of garnishee's contention that no submissible case was made, must, for the reasons stated in disposing of that contention, be ruled adversely to garnishee.

Garnishee's final assignment is that the court "erred in receiving evidence after judgment as to the proration of damages to establish $10,000 for personal injuries and $2,500 for property damage." This assignment requires us to summarize as briefly as possible extensive portions of the record. The petition under which plaintiff recovered default judgment against defendant alleged that plaintiff's truck was damaged in the sum of $2,500 and, without alleging any specific amount of damages for personal injuries alleged to have been sustained, the prayer of the petition for both personal injuries and property damages was for the gross sum of $15,000. Hence, it is clear that plaintiff sought to recover the sum of $12,500 for his personal injuries and $2,500 for damages to his truck. The judgment entered in that action, without reflecting any breakdown as to each item, recited a gross award for $14,250. The record also shows that either the evidence in that original action was not taken by a court reporter or, if taken, the notes were not transcribed and cannot now be found.

It is conceded that when the garnishment proceeding came on for trial, it was agreed between counsel and the judge that (1) the jury could return a "general verdict" (the parties and the court construing "general verdict" to mean a finding by the jury merely whether garnishee "owed" plaintiff any amount, and (2) that upon return of such a verdict in favor of plaintiff the judge should enter a "monetary judgment" (the parties and the judge construing those words to mean that "what is owed, of course, is law for his Honor to determine.") In accordance with that agreement and pursuant to forms submitted, the jury returned its verdict reciting: "We, the jury, find the issues herein in favor of the plaintiff Alvae Win-

terton, and against garnishee Farmers Insurance Exchange." Upon the return of that verdict, both parties believed it necessary under the law and statutes of Missouri that judgment for a specific amount be entered on the date of the return of the verdict, but William J. Cason, trial counsel for plaintiff in the original action, was ill in Texas and was the only person who could furnish the trial judge in the garnishment proceeding with the evidence as to the respective amounts awarded in the original action for plaintiff's personal injuries and for his property damage. The trial court decided without objection from either of the parties (although one of counsel for garnishee stated that he could not make any statement binding his client to that effect) that, in view of Mr. Cason's absence due to illness, judgment would be (and was) entered for the gross sum of $12,-500, plus interest at 6% from January 13, 1953, the date of the original judgment. The amount of $12,500, as the court stated and counsel for both parties well knew, was determined upon the basis of the fact the insurance policy fixed a $10,000 limitation for personal injuries and $5,000 for property damage sustained and the fact that plaintiff's petition in the original action sought only $2,500 for property damages. At the time of the entry of that judgment, it was also stated in open court without objection from any party that if the evidence to be given by Mr. Cason upon hearing of motion for new trial, if any was filed, did not support those amounts the judgment would be accordingly reduced.

Garnishee's after-trial motions were filed on January 22, 1960. Thereafter, counsel for plaintiff gave notice to garnishee that he would call said motions for hearing on April 2, 1960, and further notified garnishee that "at said time and place, plaintiff will offer additional evidence in support of the judgment for plaintiff rendered herein." At that hearing, garnishee objected to the admission of any evidence with reference to the monetary award theretofore made on

grounds (1) that plaintiff could "not now come in" and introduce evidence to support the judgment against garnishee; (2) that such a proceeding was unknown in the jurisprudence of this state; (3) that any judgment based upon evidence aliunde the record priorly made would be invalid; and (4) that such judgment would of necessity be based upon pure conjecture. The trial court overruled the objections, whereupon Mr. Cason testified that he represented plaintiff at the original trial; that the testimony there, all of which was in behalf of plaintiff, was that the damage to plaintiff's truck was "in excess of $2,500"; that at the conclusion of the evidence the trial court orally stated that he would award plaintiff judgment for $2,500 for the damage done to his truck; and that the total judgment would be for $14,250.

The foregoing summary of the record makes it clear that counsel for garnishee definitely agreed at the trial of the garnishment proceeding: (1) that a "general" verdict could be returned and (2) that thereafter the trial court could render a *monetary judgment*. Obviously, any *monetary judgment* fixing the extent of liability of the garnishee would of necessity be based upon (1) the amounts respectively computed and allowed by the trial court in the original action (a) for plaintiff's personal injuries and (b) for his property damage, and (2) the limitations of the policy as to the extent of garnishee's liability to the insured. Of course, in view of the fact that the judgment against defendant was for a lump sum in the original action, it would have been difficult, if not impossible, for the trial judge in the garnishment proceeding to determine the respective amounts of these awards, as made by the trial judge in the original action, had it not been for the fact that plaintiff's petition sought only $2,500 for the damage done to his truck. That fact, considered in connection with Mr. Cason's testimony, makes it reasonably certain that the remainder of the lump sum of $14,250, less $2,500, the maximum amount sought in

plaintiff's petition for property damages, was necessarily awarded for personal injuries.

We have concluded and hold that (1) the judgment herein correctly reflects the sums awarded by the trial judge in the original action for personal injuries and property damages sustained by plaintiff, as reduced within the limitations of the insurance policy, and (2) that by reason of the agreements made between counsel for the parties in the foregoing proceeding and their acquiescence without objection in the procedure adopted by the court in determining the amount of the *monetary judgment* to be entered, garnishee should be, and is estopped from objecting to the procedure followed in the ascertainment and assessment of those items.

The judgment is affirmed.

All concur.