CAMERON MUTUAL INSURANCE COMPANY, a corporation, Plaintiff–Respondent,

v.

Donald E. CHITWOOD, Louise Lundry, Bill Lundry and Denna Gail Lundry, Defendants,

and

MFA Mutual Insurance Company, a corporation, Defendant–Appellant.

No. 11741.

Missouri Court of Appeals, Southern District, Division One.

Dec. 11, 1980.

Manuel Drumm, Drumm & Leible, Sikeston, for plaintiff–respondent.

James E. Spain, Briney, Welborn & Spain, P. C., Bloomfield, for defendant–appellant.

TITUS, Judge.

Shortly after midnight April 8, 1978, 17–year–old Donald Chitwood was driving his father's automobile near Bunker, Missouri, when it figured in a one–car accident. Donald and his family resided four miles south of Ellington, Missouri, which is some 30 miles from Bunker. Denna Lundry, a 14–year–old passenger in the vehicle, was injured. MFA Mutual Insurance Company (MFA) provided liability insurance coverage to the Chitwood automobile. Cameron Mutual Insurance Company (Cameron) insured an automobile belonging to Denna's mother and its policy, inter alia, provided uninsured motorists insurance. Cameron instituted this action for declaratory judgment. The trial court ruled that the involved vehicle was not an uninsured automobile at the time of the casualty and that MFA's policy did provide liability insurance coverage for the accident. MFA appealed.

Apropos of appellate review in court–tried case, Rule 73.01-3(a), V.A.M.R., "is construed to mean that the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Murphy v. Carron*, 536 S.W.2d 30, 32 [1–2] (Mo.banc 1976). However, the duty of an appellate court to give due regard "to the opportunity of the trial court to have judged the credibility of witnesses" as provided in Rule 73.01-3(b), V.A.M.R., has little or no significance here for the entire testimony of witnesses on the concerned issue

was proffered via depositions and transcribed recorded statements secured by an insurance representative. The trial judge in this case neither saw nor heard the witnesses and, consequently, had no better opportunity than we to judge of their credibility through appearance, demeanor and the nuances of tonal variations. *Macalco, Inc. v. Gulf Ins. Co.*, 550 S.W.2d 883, 888[3] (Mo.App.1977).

The definition of persons insured in the omnibus clause of MFA's policy was as follows: "(a) With respect to the described automobile, (1) the named insured and, if an individual, his spouse, (2) any other person using such automobile with the permission of the named insured or his spouse, *provided his actual operation* or (if he is not operating) his other actual use thereof *is within the scope of such permission ....*" (Emphasis supplied). As regards that portion of the policy emphasized, supra, which is an actual operation omnibus clause, it was stated in *Allstate Ins. Co. v. Hartford Accident & Indem. Co.*, 486 S.W.2d 38, 43[1, 2] (Mo.App.1972), and repeated in *Farm Bureau Mut. Ins. Co. v. Broadie*, 558 S.W.2d 751, 754 (Mo.App.1977) (omitting citations), "The terms '*use*' and '*operation*' are not synonymous .... 'For the "*use*" of an automobile by an individual involves its employment for some purpose or object of the user while its "operation" by him involves his direction and control of its mechanism as its driver for the purpose of propelling it as a vehicle.' Thus, ... 'use' is a term of much broader scope and application than 'operate' or 'drive,' and conversely the latter terms are of narrower and more restricted meaning. Although one who operates an automobile obviously uses it, one can use an automobile without operating it." Ergo, the specific question for resolution is, considering the restrictive meaning of "actual operation," whether Donald, at the time of the accident, was operating MFA's insured vehicle within the scope of the permission granted by his father.

Although Donald started driving when he was 16 years old, or some 16 months prior to the accident, he did not have unfettered use of his father's car. In fact, he had been permitted to drive the automobile only 10 or 15 times before the accident and "[m]ost of the time I was just going to the store." Donald's father recounted that Donald "never used it over three or four times for an occasion like this," i. e., to drive for his own pleasure instead of specified errand purposes. Donald had no keys to the automobile and had to ask his parents' permission each time he used it. Before the accident in question, Donald had never driven the vehicle beyond the city limits of Ellington because his father "just didn't want me to leave the city limits of Ellington." Donald said he was given the same admonition when he was reluctantly given permission to take the automobile on the occasion in question. Also, Donald was told to be home by 11 or 11:30 p. m. After consuming a quantity of beer with a male companion, Donald and his friend secured the company of two females, one being the Denna Lundry previously mentioned. The four then undertook their unfortunate trip to and beyond Bunker where the accident occurred—30 miles further than the territorial limits of Donald's permitted use of the car and one hour or more past the time he should have returned home with the vehicle.

Eleven months after the accident when Donald's father was deposed, he had scant recollection regarding the specific restrictions imposed upon Donald's use of the car on the date of the accident except as to the time Donald was to return home with the car. The deposition suppositions made by the father as to whether or not he would have been surprised or upset before the accident if he had known Donald would drive the automobile outside of Ellington was impermissible testimony in the cause because such suppositions were no more than guesses and conjectures as to what he would have done under a hypothetical state of facts, insofar as all the evidence was that Donald had never before the accident date disobeyed the restriction to remain in Ellington with the car. 32 C.J.S. Evidence § 450, pp. 87–89. Nevertheless, and within four days after the accident, Donald's mother and father, as well as Donald, related to

the insurance representative that the permission given Donald to drive the car on the fateful night was expressly restricted by the specific limitations that he was only to operate it in Ellington and was to return home no later than 11 or 11:30 p. m.

■ Missouri follows the minor deviation rule. *Truck Ins. Exchange v. Hunt*, 590 S.W.2d 425, 429 (Mo.App.1979); *Farmers Mutual Automobile Ins. Co. v. Noel*, 211 F.Supp. 216, 219[1] (W.D.Mo.1962).[1] "In applying this rule, the courts must determine in each instance–taking into account the extent of deviation in actual distance or time, the purpose for which the vehicle was given, and other factors–whether the deviation was 'minor' or 'material.' Since the distinction between a minor and a major deviation is a matter of degree, no hard–and–fast rules can be laid down as to what constitutes a 'minor' deviation.... Where the vehicle is loaned to another for social purposes, the borrower being a friend or relative of the named insured, a general or comprehensive permission is much more readily to be assumed than in cases where the relationship of master and servant exists between the lender and borrower; thus, the courts may consider a given deviation 'minor' where a friend or relative is operating the borrowed car, while a similar deviation by an employee might constitute a 'material' deviation." 7 Am.Jur.2d, Automobile Insurance, § 266, at pp. 864–866. See also, *Winterton v. Van Zandt*, 351 S.W.2d 696, 701 (Mo.1961); 6C Appleman, Insurance Law and Practice (Buckley ed.), § 4368, at p. 227. Thus employee–deviation cases or cases where the original permittee allows a third person to drive the involved vehicle are not germane nor helpful here.

■ Cameron relies principally upon *Winterton v. Van Zandt, supra,* in urging us to affirm the judgment nisi. However, as observed in *Edgar v. Travelers Insurance Company,* 351 F.2d 690, 692 (8th Cir. 1965),

"Winterton is factually distinguishable in many respects from the present case.... While from the conversation heard by witnesses the permittee was told to go to a nearby grocery for supplies, there is evidence that the owner and permittee had a private conversation before he was given the keys and told to be on his way, and there is considerable reason to believe that the owner might well have desired to get the permittee out of the house. No express limitation on the use of the car was imposed. The owner expressed no concern when the permittee failed to return and he complained of no wrongdoing when advised that the permittee had had an accident [60 miles away]." Just as the facts in *Edgar* differ from those in *Winterton,* so do the facts in the instant case. In this matter the permission given Donald was restricted not only as to the distance and place Donald was to drive, but also as to the time he was to return home with the vehicle. Except for driving the car for a limited number of times for errand purposes, Donald had not been permitted to use the automobile for social purposes more than three or four times and on each such occasion it was necessary to obtain permission which was accompanied with directions to remain in Ellington and be home by 11 or 11:30 p. m. Under such circumstances, we would deem it most incongruent to milk from the facts the conclusion that Donald was possessed of a general or comprehensive permission to drive the automobile.

The following cases hold that, under the minor deviation rule, where an operator of a vehicle has the named insured's permission to operate it in a specified area for a limited time, the omnibus insurance clause does not extend to his use of the vehicle at a place or time or for a purpose not consented to by the insured in initially giving the permission. *Western Casualty & Sur. Co. v. Transamerica Ins. Co.,* 26 Utah 2d 50, 484 P.2d 1180 (1971)–permission given permit-

---

1. Under the so–called "liberal" or "hell and high water" rule, the bailee needs only to have received permission in the first instance to use the vehicle and his subsequent deviations from the original permission granted, no matter how great, does not relieve the insurer of the automobile. Such a rule appears to condone the tort of conversion. Cf. 7 Am.Jur.2d, Automobile Insurance, § 265, at p. 862; 89 C.J.S. Trover & Conversion §§ 1–2, pp. 531–533.

tee was to drive the automobile only for going to and from work. Permittee, instead, took his girl to a dance, returned her home and, near midnight, drove 20 miles from home to assist in starting a friend's car which had run out of gas. The accident occurred at this location. *Savage v. American Mutual Liability Ins. Co.*, 158 Me. 259, 182 A.2d 669 (1962)–permittee was authorized to borrow car at 9:30 a. m. for use in town for not over one and a half hours. The casualty occurred while permittee was driving at 7 p. m. on a highway several miles from town. *Collins v. New York Cas. Co.*, 140 W.Va. 1, 82 S.E.2d 288 (1954)–permittee was authorized to drive automobile "'uptown'" to collect a debt saying he would return the car "'in an hour or less.'" Being unable to locate his debtor, permittee drove a friend to an establishment outside the city where they drank beer. The accident occurred more than four hours past the time the car was to have been returned to the owner. *Moore v. Liberty Mut. Ins. Co.*, 193 Tenn. 519, 246 S.W.2d 960 (1952)– permittee borrowed vehicle to move household goods within the city limits. However, he drove to another town some 30 miles away where he drank whiskey and beer before the accident occurred. *Caldwell v. Standard Acc.·Ins. Co.*, 98 F.2d 364 (6th Cir. 1938)–permittee, then 17 years old, allowed to drive car in town to attend a picture show with instructions to return when the movie was finished. Instead, permittee picked up a friend and headed for another town to attend a dance. Some eight miles from permittee's hometown, the vehicle overturned. *Cypert v. Roberts*, 169 Wash. 33, 13 P.2d 55 (1932)–permittee allowed use of car to run some errands and "take her mother out." The automobile was to be returned at 10:30 or 11 a. m. However, permittee picked up and returned a friend to a hotel, went home for lunch, took her mother riding in the car and had a wreck at 2:30 p. m. *American Home Assurance Co. v. Erie Insurance Exchange*, 252 Md. 116, 248 A.2d 887 (1969)–permittee given car for express purpose of picking up his wife and child at her parents' home about 2½ miles from owner's apartment. Permittee repre-

sented trip would take a half hour to forty-five minutes. Some two and a half hours later permittee had not picked up his wife and child and had the collision in question when he was driving in a direction absolutely different from the location of the home of his wife's parents. *Frederiksen v. Employers' Liability Assurance Corporation, Limited, of London, England*, 26 F.2d 76 (9th Cir. 1928)–permittee borrowed car to attend a funeral. The permittee, after the funeral, took a joy ride 40 miles from town and had an accident. *Branch v. United States Fidelity and Guaranty Co.*, 198 F.2d 1007 (6th Cir. 1952)–permittee obtained insured's vehicle at 7 a. m. to wax it with understanding car would be returned at 2 p. m. However, permittee picked up his wife and had an accident 14 miles from where the work was to be performed on the car. *Fisher v. Firemen's Fund Indemnity Co.*, 244 F.2d 194 (10th Cir. 1957)–permittee given· vehicle to make a specified personal journey but had deviated from permitted route by approximately 100 miles when accident occurred. *Travelers Ins. Co. v. Kinney*, 238 F.Supp. 652 (E.D.Mo.1964)–permittee allowed to use insured's car with instructions to return it the following morning. The next morning permittee found that insured was not at home, kept the car and took another trip, during which time the accident occurred. *Eagle Fire Ins. Co. of New York v. Haskins*, 240 F.Supp. 283 (W.D.La.1965)–permittee loaned car to drive to destination 100 miles west of Dallas, Texas, and return. Accident occurred 265 miles east of Dallas. *Rhiner v. State Farm Mutual Automobile Ins. Co.*, 272 N.C. 737, 158 S.W.2d 891 (1968)–permittee borrowed car to pick up clothing at a store 10 blocks away but instead drove 20 miles outside the city limits where the accident occurred. *Wilson v. Hartford Accident and Indemnity Co.*, 272 N.C. 183, 158 S.E.2d 1 (1967)–permittee allowed to use automobile for 15 or 20 minutes for personal purposes, with specific instructions to return immediately thereafter. Accident occurred about 10 hours later. *Goodwin v. Home Indemnity Co.*, 255 Md. 364, 258 A.2d 220 (1969)–-permittee given vehicle to repair

door hinge. He was to return it the following morning when the repair had been completed. Accident happened between 2 and 3 a. m. that morning while permittee was just " 'riding around' ". *Mt. Beacon Ins. Co. v. Williams*, 296 F.Supp. 1094 (D.Md.1969)–permittee was to drive insured's wife to hospital and wait there to take her home. Instead of waiting, permittee picked up some friends to take them to another location when the accident occurred. See also *Auto–Owners Ins. Co. v. McGaugh*, (Mo. App.1980) [No. WD 30911 filed December 2].

We, with caution and a firm belief, and guided by the above cited authorities and others previously noted, are constrained to the conclusion that the judgment nisi is wrong. Consequently, the judgment of the circuit court is reversed and the cause is remanded to that tribunal for entry of a judgment declaring that MFA's policy did not provide liability insurance coverage for the accident and that the involved vehicle was an uninsured vehicle at the time of the casualty.

It is so ordered.

GREENE, P. J., and FLANIGAN, J., concur.