## POTTER v. PAYNE.

(District Court, E. D. New York. November 24, 1920.)

Salvage ☞13, 30—Tug, pulling barge off shore and towing to anchorage, held to have rendered salvage worth $1,500.

Where a barge, which was being dragged out to sea in ice with the ebb tide, brought up on Sandy Hook near the turn of the tide, and, though there was no great immediate danger, the captain hoisted a distress signal, a tug, which pulled the barge off shore and took her to the anchorage off Staten Island, *held* to have rendered a salvage service, rather than a mere towage service, and entitled to an award of $1,500, though the difficulties encountered were no more than she would have undertaken in towing a schooner up the harbor at the same time.

In Admiralty. Suit by Leta D. Potter against John Barton Payne, as agent, etc. Decree for libelant.

Foley & Martin, of New York City, for libelant.
Macklin, Brown, Purdy & Van Wyck, of New York City, for respondent.

CHATFIELD, District Judge. Most of the facts entering into the situation are not contradicted. Three barges, anchored in behind Sandy Hook, had been affected by ice floes for a good part of the night, and during an entire afternoon had been dragged with the ebb tide out to sea. The Conewaga happened to bring up on Sandy Hook at a time so near the turn of the tide that no further danger of drifting out to sea until the next ebb tide could have been in the minds of any of the parties. But in the meantime, with deeper water on the flood tide, the Conewaga might have been carried further ashore by the west wind, which not only was working around, but apparently increasing in strength. I think it very likely that during that afternoon, when the wind got up to the velocity of 17 miles movement for an hour, that the boat would have been in a bad situation as the tide rose, even though the ice floes diminished in quantity. The International apparently got back about the time the tide turned again to run out, and there were other towboats in the neighborhood, so that the danger of having to spend the night on the shore does not now seem very great; but it seems to me entirely reasonable that the captain of the Conewaga, not knowing whether the International or some other tug would come to his relief, and not knowing what might happen as the wind increased and the tide came in, sought help.

The reason for showing the distress signal may have been particularly that he wanted to get in communication with some one who could either rescue him or communicate his plight to the Reading Company. But at any rate he was aground on the Sandy Hook shore in a position where he did not drift further, and the court cannot find that his showing a distress signal was solely for the purpose of communicating a message. It is evident from the testimony that the Juno saw the distress signal, so that it could not have been down before they

started to the rescue. If it was taken down after that, it makes little difference whether it was because the Juno was coming or because the captain had no further reason to communicate with the shore.

It appears from the testimony that there was little danger in pulling the boat off shore, and taking her out, so as to get into the Swash Channel, which was probably the shortest as well as the most free from ice route up the bay, so that the difficulties encountered by the Juno were no more than she would have undertaken in towing a schooner up the harbor on that afternoon at ordinary towing rates. There is nothing to indicate that the opening of the Juno's seams came particularly from towing the Conewaga. She must have come in contact with the ice floes substantially as much during that day in cruising around as she did in pulling the Conewaga off, except for the immediate time when she was approaching the Conewaga.

The services rendered by the Juno, therefore, consist principally of a towage service, but under the circumstances there is nothing reprehensible, at least, in taking the Conewaga to the anchorage off Staten Island, instead of leaving her at some unprotected point around Sandy Hook; it being evident that there was too much ice and too much danger to undertake to put her back behind the Hook at that time.

The libelants have asked for a salvage award of $5,000. The claimant considers that the amount which might be charged for bringing the barge from close to shore out into deep water, where she could drop her anchor, which he estimates at $150, should be the limit of the award.

I think the services were in the nature of salvage services, rather than a mere towing of the boat a short distance to anchor, and while there were no elements of danger to the Juno, and no immediate impending disaster to the Conewaga or her cargo, I think that the situation was sufficiently serious, so that the possible stranding of the Conewaga should not be lost sight of. I think that $1,500 would be a fair award, and direct a decree for that amount.

If the amount of the decree is paid, and the apportionment between the boat and the cargo taken care of by the claimant, then no further order is necessary. In case the claimant is unable to arrange this apportionment without further litigation, the decree will be left open, so that the proper party may be brought in.